**EASTERN CANVAS PRODUCTS, INC., Appellant,**

v.

**Harold BROWN, Secretary of Defense.**

**EASTERN CANVAS PRODUCTS, INC., Appellant,**

v.

**Harold BROWN, Secretary of Defense, et al.**

**Nos. 76–1738, 77–1505.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 17, 1977.

Decided June 2, 1978.

Walter H. Fleischer, Washington, D. C., with whom Alfred F. Belcuore, Washington, D. C., was on the brief, for appellant.

Peter E. George, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, William D. Pease, Michael J. Ryan and Dennis A. Dutterer, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee, Brown, Secretary of Defense.

Eric S. Benderson, Washington, D. C., also entered an appearance for appellee, Small Business Administration in No. 77–1505.

Before TAMM and MacKINNON, Circuit Judges, and HOWARD T. MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.

Opinion for the court filed by Chief Judge MARKEY.

MARKEY, Chief Judge, United States Court of Customs and Patent Appeals:

Action by Eastern Canvas Products, Inc. (Eastern), a disappointed bidder, seeking to enjoin the award of two Defense Supply Agency (DSA) contracts. Eastern appeals from an Order of the District Court for the District of Columbia denying its motion, and granting defendants' cross-motion, for summary judgment. We reverse and remand.

Eastern, a Massachusetts corporation engaged in the manufacture and sale of canvas, synthetic and webbing products (backpack frames, straps and knapsacks) was second low bidder on two formally advertised, competitive DSA procurements. Eastern was qualified as a "small business," as defined in the Small Business Act (Act) 15 U.S.C. § 632 and implementing regulations 13 C.F.R. §§ 121.3 *et seq.*, at that time and when this suit was commenced. Having grown substantially, Eastern no longer qualifies as a "small business."

Defendants are the Secretary of Defense, the Director of DSA, and the Administrator of the Small Business Administration (SBA), sued in their official capacities.

Defendant-intervenor (Welmetco), a competitor of Eastern and qualified as a "small business" under the Act and regulations, was low bidder on the two DSA competitive procurements in dispute.[1]

## BACKGROUND

Under § 8(a) of the Act, 15 U.S.C. § 637(a), and several executive orders, E.O. 11458, 34 Fed.Reg. 4937 (1969); E.O. 11518, 35 Fed.Reg. 4939 (1970); E.O. 11625, 36 Fed.Reg. 19967 (1971), government agencies are directed to foster and promote business enterprises of "disadvantaged" persons and entities. The constitutional and statutory validity of what has come to be known as the "§ 8(a) program" was upheld in *Ray Baillie Trash Hauling, Inc. v. Kleppe,* 477 F.2d 696 (5th Cir. 1973), *cert. denied,* 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 468 (1974), in *Valley Forge Flag Co., Inc. v. Kleppe,* 165 U.S.App.D.C. 182, 506 F.2d 243 (1974), and in *Fortec Constructors v. Kleppe,* 350 F.Supp. 171 (D.D.C.1972), *aff'd,* No. 72–1924 (D.C.Cir. October 11, 1972).

SBA is authorized under § 8(a) to enter into contracts with other government agencies and "to arrange for the performance of such contracts by negotiating or otherwise letting subcontracts to small business concerns or others * * * as may be necessary to enable the Administration to perform such contracts." 15 U.S.C. § 637(a).

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. Awarding of the competitive procurement contracts at issue was enjoined by the District Court when the suit was filed. The injunction was lifted when defendants' motion was granted, but reinstated by this court pending our decision on appeal.

Pursuant to that authority, SBA established its § 8(a) program to assist "small concerns owned and controlled by socially or economically disadvantaged persons to achieve a competitive position in the marketplace," 13 C.F.R. § 124.8(b), and limited eligibility to concerns "owned and controlled by one or more persons who have been deprived of the opportunity to develop and maintain a competitive position in the economy because of social or economic disadvantage." 13 C.F.R. § 124.8–1(c)(1).

Applicants for the § 8(a) program, "must submit a business plan, including complete information regarding the concern's qualifications, which will demonstrate that section 8(a) assistance will foster its participation in the economy as a self-sustaining, profit-orientated small business." 13 C.F.R. § 124.8–2(a). Approval of the plan does not obligate SBA to award a subcontract. After consultation with other government agencies, SBA selects proposed procurements suitable for performance by § 8(a) concerns, considering such factors as:

[P]ercentage of all similar contracts awarded under the section 8(a) program over a relevant period of time, issuance of prior public solicitation of the procurement under a small business set-aside, the probability that an eligible concern could obtain a competitive award of the contract, and the extent to which other small concerns have historically been dependent upon the contract in question for a significant percentage of their sales. 13 C.F.R. § 124.8–2(b).

SBA regulations further provide that "[a] section 8(a) concern which has substantially achieved the objective of its business plan will be notified that its participation in the program is completed." 13 C.F.R. § 124.8–2(e). Having achieved its business plan objective, the concern is said to have "graduated" from the § 8(a) program.

The § 8(a) program is an exception to the general rule that "[a]ll procurements, whether by formal advertising or by negotiation, shall be made on a competitive basis to the maximum practicable extent." Armed Forces Procurement Regulation (ASPR) 1–300.1. The Department of Defense will "enter into contracts with the SBA to foster or assist in the establishment or the growth of small business concerns as designated by the SBA so that these concerns may become self-sustaining, competitive entities within a reasonable period of time," ASPR 1–705.5(b)(1), and when SBA "certifies to the Secretary concerned in accordance with Section 8(a) * * * that the SBA is competent to perform a specific contract, the contracting officer is authorized, in his discretion, to award the contract to the SBA." ASPR 1–705.5(a). In awarding its subcontracts, SBA is not bound by normal competitive considerations. 13 C.F.R. § 124.8–2(d), 15 U.S.C. § 634(b)(6).

Under the § 8(a) program, the procuring agency pays the estimated current fair market price. Additional costs for start-up, training, and initial investment, termed "business development expenses" (BDE), are funded by SBA. ASPR 1–705.5(b)(2). Market price is based on "likely costs" under normal competitive conditions, ASPR 1–705.5(b)(2), and, in repetitive procurements market price is based on the most recent award price for the same products, incorporating any interim increases. ASPR 1–705.5(c)(1)(L)(ii). When SBA and the procuring agency agree upon a fair market price, and the § 8(a) subcontract is awarded, payments are made to the subcontractor by the procuring agency. BDE costs are paid by SBA through the procuring agency, which acts as distributing agent. 1 R. Nash & J. Cibinic, Federal Procurement Law 513, n. 5 (3d ed. 1977).

### FACTS

The facts and events described by deposition witnesses are undisputed.

In December, 1975, SBA determined Welmetco eligible for its § 8(a) program as an enterprise owned or controlled by a person deprived of the opportunity to develop and maintain a competitive position because of social or economic disadvantage. *See* 13 C.F.R. § 124.8–1(c)(1).

On December 18, 1975, SBA's Office of Business Development asked DSA for a

§ 8(a) set-aside of 162,000 strap and backpack frame assemblies at an estimated value of $400,000. On January 21, 1976, DSA set aside 60,000 strap and frame assemblies for § 8(a) procurement. After negotiations with Welmetco, the New York regional office of SBA sent an April 15, 1976, letter to DSA's contracting officer, proposing a unit price of $26.50 and a total contract price of $1,590,000.

DSA advised SBA's New York office, on April 21, 1976, that the proposed price was unacceptable because it was above the market price defined in ASPR 1–705.5(b)(2). An analysis of the bidding on an earlier procurement of the same goods led DSA's contracting officer to determine a fair market price of $21.88 per unit and a total price of $1,312,800.[2] The contracting officer recommended that SBA resume negotiations with Welmetco and, if Welmetco would not agree to the $21.88 price, that SBA should submit to DSA a Certificate of BDE for any price in excess of $21.88.

It appears that sometime prior to February 20, 1976, Welmetco had requested SBA to furnish government equipment for use on the proposed § 8(a) procurement. Welmetco originally requested about $400,000 worth of equipment, but reduced the amount to $200,000, then to $100,000 and, eventually to about $16,000.

On February 20th, Bernard Zeller, Deputy Director of SBA's New York regional office wrote the Defense Contract Administrative Services Region, New York, (DCASR), a component of DSA, requesting review of Welmetco's equipment request. DCASR personnel visited Welmetco on February 27 and March 3, 1976, and concluded that Welmetco did not need any equipment for the § 8(a) procurement.

The basis for that conclusion was that with its existing equipment and slightly over one work shift, Welmetco was then performing under two contracts for approximately 50,000 units. The DCASR report indicated that Welmetco foresaw no difficulties with adding a full second shift, and possibly a third, if necessary.

In apparent response to further equipment requests by Welmetco, Zeller again wrote DCASR on April 7, 1976, requesting a review of Welmetco's ˙equipment needs. DCASR responded on April 28, 1976, and again concluded "that Welmetco does not require˙ the capitol [sic] equipment for subject procurement [the § 8(a) procurement]."

On April 15 and 16, 1976, DSA issued the two Invitations for Bids (IFB's) in the competitive procurements giving rise to the present controversy. DSA 100–76–B–0998 ('0998) sought bids on 270,000 units, each unit consisting of pack frames and four straps. DSA 100–76–B–1008 ('1008) sought bids on 303,556 units, each unit consisting of two straps. Both solicitations were restricted to small business concerns and opening dates were set for May 5 and 10, 1976, respectively.

Because SBA's § 8(a) request had been for more than the 60,000 units set aside, DSA's contracting officer believed SBA was aware that DSA would be issuing the '0998 IFB for additional units, but was uncertain whether SBA anticipated in the '1008 solicitation.

On˙ April 20, 1976, Welmetco's president, Mr. Medina, wrote SBA in Washington, D. C., requesting "any assistance that your good offices may be able to offer * * * towards [sic] a rapid and successfully [sic] award of 60,000 Frame and Strap Assemblies under the 8A Program." Mr. Medina indicated that SBA's New York office had advised him of a problem with the Department of Defense (DOD) on the price˙ and BDE funds for $104,000 worth of factory equipment. Medina insisted that Welmetco needed $104,000 worth of equipment "to perform * * * [the § 8(a) contract] at the negotiated price *and also make us competitive for future contracts.*" [Emphasis added.] The record does not reveal any direct response to that letter. Mr. Medina also noted:

---

2. The earlier procurement was for 102,648 units and was awarded to Eastern at unit prices ranging from $20.14 to $20.49.

This program [the § 8(a) program] and the BDE funds are of the utmost importance because an additional procurement for 270,000 identical items on IFB DSA100–76–B–0998 was issued on the 15th of April 1976 with a bid opening of May 5th. The 8A procurement permits continuity between our current contract of 40,000 and the new program of 270,000 and it is vitally important that we know that the 60,000 piece contract is awarded to us prior to our pricing the new procurement, since continuity would make all the difference in the world in our pricing.

Welmetco and SBA agreed that Welmetco would receive $25 per unit under the § 8(a) subcontract, but if Welmetco was awarded the competitive '0998 contract, it would receive $21.88 or its bid price under '0998, whichever was higher, on the § 8(a) subcontract. It was improper for an SBA employee to commit an expenditure of $187,000 ($25–21.88 = $3.12 × 60,000 = $187,000) without formal approval and written authorization for BDE. Though the record is not entirely clear on the matter, it appears that SBA also agreed to provide Welmetco with some equipment and financial assistance. The importance of that agreement, if it occurred, is discussed *infra*.

By telegram of April 30, 1976, SBA accepted DSA's estimated fair market price of $21.88 for the § 8(a) set aside. DSA confirmed that agreement on the morning of May 5, 1976, by hand-delivering a written confirmation to a Welmetco representative waiting in the DSA offices. That procedure was highly unusual. A formal § 8(a) agreement between DSA, SBA and Welmetco was not signed until two weeks later.

No BDE forms for the $187,000 were filled out and no BDE payment was approved, because, as we shall see, Welmetco successfully bid on the competitive '0998 procurement.

DSA's contracting officer was pressured to award the § 8(a) contract prior to the opening of bids in the competitive '0998 procurement. SBA's acceptance of DSA's $21.88 figure was transmitted by telegram to meet Medina's request that the § 8(a) contract be awarded before bid opening in '0998. Both SBA and DSA, during the few days before May 5th, received pressure from Welmetco, the Latin American Manufacturers Association (LAMA) and others, to act favorably to Welmetco in the § 8(a) set aside.

On May 4th, the day before bids in '0998 were to be opened, Mr. Goldstein, a consultant for Welmetco, telephoned DSA, advising that price agreement had been reached on the § 8(a) subcontract and that an award was in process. Mr. Goldstein also said Welmetco wanted to compete in the '0998 procurement and requested that the § 8(a) award be expedited.

The DSA official who had talked with Goldstein phoned DSA's contracting officer and indicated that the § 8(a) subcontract should be expedited. The contracting officer objected to an expedited § 8(a) award because of the bid opening on '0998. His objection went unheeded and he was directed to expedite the § 8(a) award.

To expedite the § 8(a) award, prior preparation of certain required documents was waived. SBA did not provide a written certificate of competency to DSA until May 7th, two days after the '0998 award, though it had been supplied when the § 8(a) subcontract was actually signed weeks later.

On May 3, 1976, Welmetco had submitted a bid on the '0998 contract in the amount of $26.50 per unit. On May 5, 1976, a number of events took place. At approximately 10:00 a. m. DSA confirmed the § 8(a) award to Welmetco by so advising Goldstein;[3] at some point during the day SBA authorized an advance payment of $200,000 to Welmetco for use on the § 8(a) contract (on May 25th SBA increased that advance payment to $600,000); Welmetco reduced its bid price in '0998 to $18.13 per unit, less a 2

---

**3.** That was contrary to normal procedure, but the contracting officer said normal procedure would "take too long."

percent discount; and, at 2:00 p. m. bids on '0998 were opened. Welmetco's bid was lowest, Eastern's ($19.72–$20.03 less 2 percent discount), was next lowest.

On May 10, 1976, bids were opened in the '1008 competitive solicitation. Welmetco had initially bid $3.98, but raised its bid on May 7th to $4.22, which turned out to be one cent per unit less than Eastern's $4.23 bid. There was no evidence establishing that Welmetco raised its bid to within 1 cent of Eastern's because of a leak informing it of the price by Eastern.

After the bid openings, the required pre-award survey of Welmetco was conducted by DCASR. On June 9, 1976, DCASR issued a negative recommendation for award of the competitive contracts because of Welmetco's unsatisfactory "financial capability."

On June 28, 1976, Zeller sent a telegram to DSA's contracting officer informing him that SBA had provided Welmetco with $600,000 in advance funds for use on the § 8(a) subcontract and that Welmetco may be eligible for an increase in its loan ceiling from $388,000 to $500,000. On July 9, 1976, DCASR changed its earlier negative recommendation and recommended the award to Welmetco. The bases for the change were the $600,000 advance on the § 8(a) subcontract, a $200,000 SBA 90% guaranteed loan, and an additional $150,000 loan. It appears that the $600,000 had been limited to use on the § 8(a) subcontract. It is not clear from the record whether the $200,000 and $150,000 loans were restricted to the § 8(a) subcontract or the competitive contracts.

Efforts continued, by and on behalf of Welmetco, to obtain government equipment.[4] On September 27, 1976, DSA's contracting officer (Mr. Sherry) convened a meeting in his Philadelphia office with an SBA official (Mr. Sugrue), Welmetco's president (Mr. Medina), and an attorney for Welmetco (Mr. Cervera). Sherry called the meeting "to yell at" Sugrue and Medina because Sherry had discovered that, without his knowledge, SBA had made a commitment prior to the § 8(a) award to provide government equipment to Welmetco. When Sherry had computed the $21.88 § 8(a) price, he had not been aware that Welmetco would be receiving government furnished equipment (GFE). Neither the '0998 nor '1008 contained any provision for GFE. Though there was no provision in the § 8(a) subcontract for GFE, and despite DCASR's repeated denial that Welmetco required such GFE for performance of the § 8(a) subcontract, Sherry relented and instructed a subordinate to provide such equipment. Sherry said he felt obligated to provide such equipment because "a member of the government made the commitment and I intended to fulfill it even though I was not aware of it."

An SBA official characterized those dealings as "impossible unless someone exceeded their authority because there is no way to add additional consideration onto our contracts in these circumstances." The official said that including BDE funds (for funds were necessary to provide GFE for Welmetco) after contract award was "against Agency policy" and contrary to SBA procedure.

On the day after the meeting in Sherry's office, Medina wrote Sherry and again emphasized the necessity of receiving the promised GFE. In addition to referring to the § 8(a) subcontract, Medina made reference to the '0998 contract. Medina reiterated that "the availability of this equipment by the United States Government to my firm was an integral part of the contract." It is unclear which "contract" Medina was referring to; the § 8(a) subcontract or the competitive contracts. As discussed below, equipment does not appear to have been necessary for completion of the § 8(a) contract and would constitute an improper subsidy in connection with the competitive contracts.

On a form dated September 28, 1976, (almost 4 months after the competitive bid openings) SBA authorized $16,066.50 in BDE for Welmetco to purchase the desired equipment. Though the form makes reference to the § 8(a) subcontract and that

---

4. SBA and LAMA made repeated efforts to obtain equipment for Welmetco.

indicates that the BDE is for equipment necessary to perform that subcontract, the justification for the BDE, elsewhere on the form, states: "[i]n order to perform more efficiently under this contract, *as well as future government contracts for the same or similar items,* the Contractor * * * [requests these funds]." [Emphasis added.]

### THE TRIAL COURT

The trial court found that "[t]he record herein supports the conclusion that the 8(a) program subcontract was expedited in order to help Welmetco participate in the competitive bidding on * * * ['0998] * * * [and] also affected the bidding on * * * ['1008]." The court also commented on the equipment dealings and advance payment, but noted that Eastern had "scoured the record to compile a list of actions and alleged procedural irregularities which, when taken together, are asserted to amount to bestowing special competitive advantage for Welmetco." The court held:

> It does not appear from the record * * * that defendants overstepped their authority or abused their discretion with respect to individual steps taken in expediting the award of the 8(a) subcontract * * *. [D]efendants were * * * providing permissible assistance to Welmetco to help it achieve a competitive position * * *. Plaintiff's allegations thus boil down to a question of timing.
>
> That Welmetco was able to participate in the competitive bidding and submit low bids * * * indicates that the 8(a) program was doing precisely what it was intended to do. Moreover, under SBA Standard Operating Procedures, a failure on the part of 8(a) program participants to actively pursue business opportunities

results in a termination of the 8(a) program benefits. SBA Standard Operating Procedure No. 60–41–2 at ¶ 66(a)(9).

In helping Welmetco achieve a competitive position in the market place by pushing through the 8(a) subcontract award before the competitive bids on DSA Solicitation No. 100–76–B–998 were opened, defendants did not abuse the 8(a) program or exceed the statutory and regulatory authority for that program. Their actions were "rationally related to a proper government purpose".

Eastern contends here, as it did below, that government officials abused the § 8(a) program, beyond their statutory and regulatory authority, to the extent that unfair and unequal treatment of bidders occurred on the competitive '0998 and '1008 contracts, and, further, that award of the competitive contracts would violate the Fifth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

### ISSUE

The dispositive issue is whether the district court erred in granting the government's motion for summary judgment, *i. e.,* whether the actions of government officials in administering the § 8(a) program and the competitive bids involved in this case could not constitute as a matter of law, such unfair and unequal treatment of Eastern as to preclude award of the competitive '0998 and '1008 contracts to Welmetco.[5]

### OPINION

#### *Actions "Expediting" the § 8(a) Subcontract*

Admitting that DSA and SBA officials "expedited" the § 8(a) award by disregard-

---

5. It is unnecessary to discuss in detail the questions raised with respect to Eastern's standing, or the constitutionality of the § 8(a) program, or its legality under Title VI of the Civil Rights Act. Contrary to the government's argument, Eastern is not contesting the award of the § 8(a) subcontract, but is contesting what it considers an unfair award of the competitive contracts, for which purpose, as the court below clearly pointed out, it has full standing. *Scanwell Laboratories v. Shaffer,* 137 U.S.App. D.C. 371, 424 F.2d 859 (1970). The § 8(a) program was held constitutional and not racial-

ly motivated in *Fortec Constructors, supra.* Eastern argues that a use of the § 8(a) program to "infect" competitive bidding constitutes unconstitutional inequality of treatment. That view begs the question, which is whether the present use (or abuse) of the § 8(a) program illegally affected competitive bidding. The effect of Welmetco's § 8(a) subcontract on the competitive bidding here would be the same, whether SBA's overall administration of the § 8(a) program predominantly favored minority enterprises or was more evenly distributed to other "disadvantaged" firms.

ing a number of SBA's Standard Operating Procedures (Procedures), the government insists that no law applicable to SBA or to the § 8(a) program was violated. Adopting an apparent "offense-equals-best-defense" stance, the government asserts that the expediting actions reflected in the record should be "applauded," and that those actions evidence "a successful program." Though we agree with the trial court that a mere expediting of the § 8(a) subcontract award cannot *per se* be viewed as illegal, we do not consider the expediting actions of record worthy of judicial applause; nor do we view the record here as reflecting only expediting actions.

The § 8(a) subcontract price was made dependent on the outcome of a competitive bid; to that extent, it can be said that SBA "used" the DSA competition to save itself an expenditure of BDE funds; an SBA official, without authority to do so, made a non-divulged oral commitment to supply government equipment for use on the subcontract; and BDE funds were promised without approval of the authorized SBA official and without advance notice to DSA. The bypassing of Procedures applicable to these and other events was not merely a change or waiver of miniscule internal administrative practices. The Procedures of SBA continued in force throughout the period involved and beyond. Presumably, they were applied and followed in the handling of other § 8(a) subcontracts before, during, and after the time of the events giving rise to this case.

■ Selective disregard of established Procedures reflects an engineered manipulative administration of the § 8(a) program, impermissibly intertwined with ostensibly open bids presumably devoid of subsidy or prejudicial, discriminatory assistance. The result can be a denial of the even-handed, consistent management rightfully expected of our government. *See, Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). If such actions be repeated, post-hoc explanations in a courtroom will not avoid destruction of

the ability of present and potential § 8(a) program participants to rely on SBA's Procedures. Procedures which may be followed or ignored at whim can hardly be considered worthy of the name "standard." Accordingly, we express no opinion on whether the present § 8(a) subcontract award to Welmetco could survive judicial review sought by one contesting the § 8(a) award itself.

### Relationship of "Expediting" Actions to Competitive Bids

■ Though Eastern argues persuasively that government officials "abused" the § 8(a) program by actions beyond their authority and discretion, the district court held the contrary. We need not resolve that issue, however, for Eastern is admittedly not contesting an abuse of the § 8(a) program *per se.* The determinative issue is whether, as a matter of law, the actions of DSA and SBA officials could not have had an illegal impact on the bidding in the '0998 and '1008 competitions sufficient to render those competitive contract awards invalid. In short, actions taken in connection with the § 8(a) program award are relevant here only insofar as an appropriate nexus is shown between those actions and the competitive procurement.

Eastern makes no charge of fraud or bribery in connection with the competitive contracts. It is true that "economies of scale" resulting from the subcontract on only 60,000 units seems an unrealistic explanation of Welmetco's substantial reduction (from $26.50 to $18, less 2%) on the '0998 contract. Further, Welmetco *increased* its '1008 bid with knowledge that the contract was to go to the *lowest* bidder, and the increase was but 1 cent below Eastern's bid. Those circumstances may serve to raise suspicions that Eastern's bids had been "leaked," or that some other violation of law or regulation occurred in the awarding of the competitive contracts on May 5, 1976, and May 10, 1976. But mere suspicion cannot form the basis of judicial decision.

There is of record no evidence, and no charge, that Welmetco or any government

official was aware, at any time prior to the bid openings on May 5th and May 10th, of what Eastern's bids were going to be. We cannot speculate on whether Welmetco's files relating to its bid computations would reflect such awareness. Hence, the "expedited" award of a § 8(a) subcontract, however it assisted Welmetco in participating in the competitive bidding, did not on this record insure that Welmetco's bids would be the lowest. Government officials disregarded Procedures to get Welmetco into the race; they did not, and could not in view of the evidence here, insure that it would win at the time of bid opening.

If Eastern's bid had been lowest it would have won the disputed contracts. If Welmetco had stayed out of the competition, or had been left to its own devices (and its $26.50 bid) Eastern would have won the '0998 contract. It is less certain that Eastern would have won the '1008 contract if Welmetco had not been assisted, for both of Welmetco's bids on '1008 were below that of Eastern. In all events, the '0998 and '1008 contracts were, as normally required by law, awarded in May to the lowest bidder. Government officials, by expediting a § 8(a) subcontract, and promising other valuable assistance to Welmetco knowingly enabled a disadvantaged firm to offer a price lower than it might otherwise have offered. They did not knowingly, on this record, enable that firm to offer a price guaranteed lower than Eastern's at the bid openings. If, however, Welmetco was unlawfully preferred, the extent of the preference need not be determined. Unlawful preference and assistance is sufficient to disqualify a bid in an open competition where no preference is permissible.

### Restriction of Competitive Bidding to "Graduates" of the § 8(a) Program

Eastern's complaint regarding the expediting of the § 8(a) contract is directed at

the *timing* of the events prior to and on May 5, 1976, and at the relationship of those events to a particular bidding competition. Eastern alleges that the § 8(a) program must be limited to *preparing* disadvantaged businesses, for competition in the marketplace only *after* such businesses "graduate" from the § 8(a) program. To award a § 8(a) subcontract to Welmetco virtually simultaneously with its first participation in a competitive bidding solicitation, says Eastern, is to seek "instant competitiveness" for Welmetco.[6]

In support of its argument for limiting competitive bidding to firms never disadvantaged and "graduates" of the § 8(a) program, Eastern cites the Congressional Record and remarks apparently made by legislators; the wording of the Act, regulations, and Procedures; and the deposition testimony of SBA's own officials in the present case. Those citations tend to indicate that the normal operations of the § 8(a) program to date, and the general expectation of how the § 8(a) program would operate, tend to support Eastern's "graduates only" view.

We do not adopt the government's assertion that Eastern's citations amount to mere "semantic quibbling." It may also be, moreover, that the requirement for SBA to consider whether a § 8(a) eligible concern "could obtain a competitive award," before awarding a § 8(a) contract, 13 C.F.R. § 124.8–2(b), *supra,* and the cessation of participation of § 8(a) concerns upon "graduation," 13 C.F.R. § 124.8–2(e), together indicate an intent to maintain a wall between § 8(a) and competitive contracting environments. However, we need not, and therefore do not, determine in this case whether simultaneous participation by "disadvantaged" enterprises in § 8(a) subcontracts awarded by SBA and in competitive contracts awarded by DSA, must be judicially precluded, or whether SBA's Proce-

---

**6.** Eastern professes "outrage" that Welmetco could in a few days ascend from "disadvantaged" status to a business capable of handling $7,201,000 in government-awarded contracts. Defendants say that circumstance shows the success of the § 8(a) program in this instance.

Neither view is relevant to the issue of whether the expediting of Welmetco's § 8(a) subcontract so tainted the competitive bidding as to require judicial intervention in the award of the disputed contracts.

dure, No. 60–41–2 at ¶ 66(a)(9), *requiring* disadvantaged firms to actively pursue other business opportunities while participating in the § 8(a) program, must be struck down.

As was said in *Ray Baillie, supra* at 704, 705:

It is not the duty of the courts to evaluate the arguments regarding allocation of government procurement[s] contracts or to consider the wisdom of the present programs. *American Trucking Ass'ns v. Atchison, T. & S. Ry.,* 1967, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847. Rather our task is limited to determining whether the SBA has abused its discretion or exceeded its statutory authority in adopting the section 8(a) program. There is ample indication that small business concerns owned by disadvantaged persons have traditionally received a disproportionally small number of government procurement contracts. It is certainly reasonable, therefore, for the SBA to make a special effort to alleviate this imbalance. Section 8(a) of the Act provides the authority to do so.

Furthermore, the plaintiffs cannot complain because a specific type of small business concern is the primary beneficiary of the present program. It is well settled that an agency need not "strike at all evils at the same time," *Semler v. Dental Examiners,* 1935, 294 U.S. 608, 610, 55 S.Ct. 570, 571, 79 L.Ed. 1086, but may [sic] "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute." *Williamson v. Lee Optical Co.,* 1955, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563. *See Katzenbach v. Morgan,* 1966, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828; *Roschen v. Ward,* 1929, 279 U.S. 337, 49 S.Ct. 336, 73 L.Ed. 722. [Footnotes omitted.]

And, again, at 709:

Finally, the plaintiffs contend that the SBA's section 8(a) program, by using the government's lending and contracting power to enhance All American's competitive position, violates due process. In effect, the plaintiffs argue that the sec-

tion 8(a) program enabled All American to receive a premium price above that which would have prevailed under competitive bidding and that All American has since used this premium to submit low bids for private commercial contracts, causing the plaintiffs to lose some of their customers to All American.

It has long been recognized that the government, like private individuals and businesses, has the power "to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.,* 1939, 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108. In exercising this power, of course, the government remains subject to the constitutional requirement of due process. But in the case at bar we cannot accept the plaintiffs' argument that the section 8(a) program is unconstitutional because the plaintiffs may be disadvantaged competitively. There is no constitutional duty to offer government procurement contracts for competitive bidding. The SBA has the statutory authority to assist small business concerns through private placement of contracts. We have already held that the SBA has not abused its discretion in adopting the section 8(a) program. The program may produce some inequalities among small business concerns as a class. But in the area of socio-economic legislation, the government's action must be upheld if it is rationally related to a proper government purpose. *Dandridge v. Williams,* 1970, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491; *Walters v. St. Louis,* 1954, 347 U.S. 231, 74 S.Ct. 505, 98 L.Ed. 660. We hold that it is.

 Every § 8(a) program participant, when it bids on a competitive contract, and whether it does so immediately after "graduation" from the § 8(a) program or while still participating in that program, can be said to have been "assisted" or "subsidized," or "advantaged," as against other competitive bidders, by virtue of its § 8(a) subcon-

tracts, present or past.[7] The same is true whether the administration of the § 8(a) program in relation to that participant was in full accord with all regulations and Procedures of SBA or whether it involved unauthorized disregard thereof; whether SBA's grant of a § 8(a) subcontract to that participant was done with an eye toward achieving marketplace competitiveness in 3 years or overnight; and whether SBA was pointing that participant toward a specific competitive solicitation on which bids were to be opened next week or next month.

### Was There, On the Whole Record, Improper Preference in Competitive Bidding?

Eastern devotes the vast majority of its brief and argument to improprieties in the § 8(a) subcontract award to Welmetco; yet it does not, and as a non-§ 8(a) participant it cannot, request us to overturn the award of the § 8(a) subcontract to Welmetco. It is some special advantaging of Welmetco in the '0998 and '1008 competitive bidding, something beyond the mere participation of Welmetco in the § 8(a) program, against which Eastern must necessarily complain. Though Eastern in its Reply Brief describes the issue of improper preferential treatment of one bidder in a competitive procurement as "dispositive," the sole specific reference thereto in the briefs of Eastern is comprised of a single paragraph.

Eastern cites a case involving an ERDA requirement for a second round of negotiations because of post-award "negotiations," and a case involving a Comptroller General requirement for a second round of competitive bidding because the first invitation to bid was ambiguous. Neither case had anything whatever to do with a competitive bidding participated in by a firm holding a § 8(a) subcontract. The remainder of Eastern's paragraph on this dispositive issue repeats its complaint against an award of the § 8(a) subcontract "on the very day" of a

competitive bid opening, the "subsidizing" represented by § 8(a) subcontracts on the same product sold to the same agency, and to the pricing of § 8(a) subcontracts, most of which are merely restatements of Eastern's argument for restriction of competitive bidding to firms never disadvantaged and to § 8(a) "graduates."

Eastern's paragraph ends, however, with a demand for "equal treatment." Though the demand confusingly applies the word "contract" to the different contracting environments involved in § 8(a) subcontracts and competitive bidding, it does illustrate a basis for Eastern's allegation of "illegal disparate treatment." Eastern infers that the equipment promised for use under the subcontract, but also useable in performing the competitive contracts was a promise of equipment to one competitive bidder not made to other competitors. However, a promise of equipment for use under a § 8(a) subcontract awarded a week or a month earlier would have had the same effect on the competitive bidding. If that were all that occurred, Eastern's argument would again reduce to a presently unacceptable and unnecessary insistence that those having § 8(a) subcontracts be judicially *precluded* from competitive bidding.

It appears on the record, however, that more may have occurred. The record reveals a number of unanswered questions, the answers to which may support Eastern's allegation that government funds and equipment not needed for the § 8(a) subcontract were furnished solely and intentionally to give Welmetco an unfair and illegal competitive advantage on the competitive contracts.

It is unclear why SBA elected to promise Welmetco equipment for the § 8(a) contract, in the face of repeated determinations by DCASR officials that it was not needed. There is no indication in the record that SBA officials ever visited Welmetco's

---

7. Just as the entire class entitled "small business" can be said to be advantaged, as against larger businesses, by the set-aside program in which competitive contracts, such as those at issue here, are earmarked for "small business" and larger businesses are denied any participation whatever. Eastern, while it was a member of the "small business" class, was a beneficiary of that set-aside program.

plant; ever inquired why the equipment was necessary when Welmetco was already adequately performing two other contracts; or ever went beyond Welmetco's bald assertions of need before promising the equipment.

It is also unclear why, if SBA thought Welmetco actually required the equipment, SBA did not include that equipment in the § 8(a) subcontract and formally notify DSA of the matter. ASPR 1–705.5. On the present record, it appears that the equipment assistance matter was handled clandestinely by SBA, with no regard for and in violation of normal award processes.

Though the equipment was ostensibly for use on the § 8(a) subcontract alone, the agency found that it was not needed for that contract and there are indications of record (Welmetco's letter of April 20th and the BDE authorization form) that Welmetco and SBA intended the equipment to be used also in performing the competitive contracts. However, none of the terms of any of the contracts called for equipment assistance.

Moreover, we are cited to no specific authority for the type of unilateral promise of equipment made herein. If that authority exists, it is not of record here. The government says authority for cash advances and equipment resides in 41 U.S.C. § 255, 41 C.F.R. §§ 1–30.400.419, and 15 U.S.C. § 637(a). Title 41 deals with public contracts, and § 255 contains authority for advance payments on those contracts. The C.F.R. provisions implement that authority. Section 637(a) merely furnishes authority for the § 8(a) program. If equipment promises can be said to fall within the broad ambit of § 637(a), that section specifically calls for agreement on "terms and conditions" between SBA and DSA's procuring officer. The record contains no basis for the view that Congress intended § 637(a) as authorization for *ex post facto* "agreements" like those present here or for equipment assistance on contract where it was not needed.

Though the government has authority to advance payments on a contract, it appears that the advance payments herein may have been impermissibly engineered to give Welmetco a distinct competitive advantage in the competitive procurements. Though legally useable for certain purposes and under certain circumstances, the payments made to Welmetco herein raises the specter of use for another purpose and thus of illegal administration. In a post-award survey, Welmetco was apparently found financially incapable of performing the competitive contracts. Under normal procedures, the contracts would in that case have been withdrawn from Welmetco and awarded to the next lowest bidder, Eastern. 10 U.S.C. § 2305(c); ASPR 1–904.1, 2–407.1. It appears that Welmetco subsequently was considered to have become financially responsible on the competitive contracts *only* after and because it had received cash advances and SBA guaranteed loans ostensibly for the § 8(a) subcontract.

▮▮▮ If those advance payments and SBA loans are found to have been designed and used to render Welmetco "responsible" to perform the competitive contracts, then there is merit in Eastern's allegation that the § 8(a) program and the competitive program were in this particular case illegally intertwined. The focus of concern is not whether payments and guarantees are made before or after competitive bids are open and contracts are initially awarded, but whether payments and guarantees not needed on one contract are used surreptitiously to insure award or retention of a different contract. Advance payments provided for by statute and regulation, as well as equipment, can be made available only *when necessary for the performance of a particular contract;* here, the § 8(a) subcontract. Payments or equipment given not to enable performance of a particular contract, but only to enable a non-eligible contractor to obtain or retain a different contract, render full, free and fair competition impossible.

ASPR 13–501 provides:

It is the policy of the Department of Defense to eliminate the competitive advantage that might otherwise arise from

the acquisition or use of Government production and research property. This is accomplished by charging rental or by use of rental equivalents in evaluating bids and proposals as provided in 13–502 and 13–503. The only exception to this general policy is stated in 13–505, which provides that certain costs or savings to the Government related to providing such property to contractors shall be considered in such evaluation, regardless of any competitive advantage that may result from this exception.

There being no payments or equipment called for in any of the contracts here involved, it is clear that GSA evaluated neither the fair market price for the § 8(a) subcontract nor the bids in '0998 or '1008 with an eye toward the use of government equipment, as provided for in ASPR 13–501. *Cf.*, 43 Comp.Gen. 327 (1963).

### CONCLUSION

In sum, we do not say that bidding on competitive contracts is, as a matter of law, foreclosed to disadvantaged recipients of a § 8(a) subcontract, or that firms which receive a § 8(a) subcontract more than a given period prior to a competitive bid opening, may participate in that competition, but that those who receive a § 8(a) subcontract within a closer time frame may not. Judicial deference, absent arbitrary, capricious, or illegal action, requires that such administrative considerations be left to those charged with carrying out a proper government purpose.

■ It may well be that government officials strained the limits of their § 8(a) authority in expediting Welmetco's § 8(a) subcontract. It may also be that Welmetco, if it eventually retains the '0998 and '1008 contracts, will make unusual progress toward marketplace competitiveness. Eastern's disappointment at its loss of the competitive awards was exacerbated by the knowledge that the lowest bidder was a firm awarded a § 8(a) subcontract that "very day" and who would not have other-

wise been the lowest bidder. None of those circumstances, however, would alone be sufficient to warrant this court's intervention in the allocation of the '0998 and '1008 procurement contracts at issue here.

The apparent use of equipment and advance payments on the § 8(a) subcontract, to engineer Welmetco's retention of the competitive contracts, must, however, be viewed in a different light.

■ When issues are found, during the focused inquiry of an appeal, which were not adequately resolved below, it is appropriate to remand for the trial court to resolve those issues. *See, e.g., Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution,* 184 U.S.App.D.C. 397, 566 F.2d 289 (1977).

■ We are unable on this record to determine: the true motives or purpose for, or the basis and full effect of, SBA's disregard of DCASR's recommendations regarding the absence of need for equipment; SBA's failure to notify DSA of the equipment promise; the actual use, if any, made of the equipment, or whether there was in fact ever a need for equipment and cash payments to enable performance of the § 8(a) subcontract, or the effect of promised assistance on Welmetco's competitive bid. We therefore remand for determination of those issues and for a determination of whether, and if so to what extent, SBA's advance payments and loan guarantees illegally influenced the final, post-survey retention of competitive contracts in Welmetco's hands.

■ If on remand the court finds that the equipment assistance or advance payments operated to directly influence the total competition in '0998 or '1008, by transforming Welmetco into a "responsible" bidder, or into one able to use government equipment without a corresponding bid evaluation, the court is directed to enter an injunction against the award of either '0998

or '1008 to Welmetco.[8] If the court does not find that equipment assistance and advance payments had such effect, the court is directed to enter judgment for defendants.

Accordingly, the order granting summary judgment to defendants is reversed and the case is remanded for proceedings consistent with this opinion.

---

8. Eastern, as next lowest bidder, and if otherwise qualified, would presumably receive the '0998 and '1008 contracts. Though Eastern is no longer a "small business," the controlling date is that of the challenged awards and Eastern was at that time a small business. 42 Comp.Gen. 219 (1962).