AMEX SYSTEMS, INC., et al., Plaintiffs,

v.

**Michael CARDENAS, Administrator,
Small Business Administration,
Defendant.**

Civ. A. No. 81–1223.

United States District Court,
District of Columbia.

July 22, 1981.

Curtis R. Smothers, Earl H. Douple, Smothers, Douple, Gayton & Long, Washington, D. C., for plaintiffs.

John M. Gibbons, Samuel C. Jackson, Strook, Strook & Lavan, Washington, D. C., for P & B Services, intervenor.

Judith A. Bartnoff, Asst. U. S. Atty., Washington, D. C., for defendant.

JOYCE HENS GREEN, District Judge.

### MEMORANDUM OPINION

This action is brought by seven companies that participate in the program established by Section 2[8](a) of the Small Business

Act, 15 U.S.C. § 637(a), for small businesses owned by socially and economically disadvantaged individuals.[1] After the plaintiffs moved for a preliminary injunction, and prior to the hearing on that motion, with the consent of all parties, the proceedings were converted to a final action on the merits of plaintiffs' complaint, which seeks injunctive and declaratory relief from certain allegedly unlawful actions taken by the defendant, Michael Cardenas, Administrator of the Small Business Administration ("the Administrator" and "SBA"), the government agency charged with operating the Section 2[8](a) program.

An understanding of procedures in the Section 2[8](a) program is important to a full resolution of this dispute. The program is open to "small businesses" as defined by Section 2[3] of the Act, 15 U.S.C. § 632, and accompanying regulations which contain size standards for businesses and a procedure for determining whether an entity qualifies as a small business. *See* 13 C.F.R. §§ 121.3-4—.3-6. These small business entities additionally must be socially and economically disadvantaged as determined by SBA. Once so found, a business is eligible to subcontract with SBA, which has contracted with other procuring government agencies participating in a project under Section 2[8](a).

A participant in the 2[8](a) program may be removed "for good cause," under 13 C.F.R. § 124.1–1(e). The applicable regulations establish twenty-six examples of good cause, the first being, "(i) failure of a section 2[8](a) business concern to continue to meet the standards of eligibility set forth in these regulations." Other examples of good cause include inadequate performance of contract obligations, violation of SBA regulations, and convictions for criminal acts.

The Section 2[8](a) program is focused at aiding minority owned businesses to become competitive. Central to this ideal is that after a period of participation in the program, a business should develop into a viable entity, with the capacity to survive the fierce competition in the American marketplace. Thus, businesses are expected, at some point consistent with their own projected growth, to "graduate" from the 2[8](a) program into the normal market for government and, of course, other contracts.

With this goal in mind, the Small Business Act requires entities to submit business plans "with specific business targets, objectives, and goals for correcting the impairment of such concern's ability to compete . . . ." 15 U.S.C. § 636(j)(10)(A)(i).[2] Prior to the enactment of Public Law No. 96–481, these business plans did not need to include any fixed or projected date for graduation from the § 2[8](a) program.[3] The new Act, however, mandated that the SBA promulgate regulations within one hundred and twenty days from the effective date of the Act (October 21, 1980) regarding the submission of business plans, including a graduation date mutually agreed upon by the 2[8](a) participant and the SBA. The statute required that the period of graduation be fixed by the concern and the SBA no later than eighteen months after the Act

---

1. Originally, eight participants in the 2[8](a) program initiated this action, but one of those companies withdrew. Subsequently P & B Services sought leave to intervene in the suit, which the Court granted after all parties consented.

2. See also *Eastern Canvas Products, Inc. v. Brown*, 580 F.2d 675 (D.C.Cir.1978), where the Court noted,

   Applicants for the § 8(a) program, "must submit a business plan, including complete information regarding the concerns' qualifications, which will demonstrate that section 8(a) assistance will foster its participation in the economy as a self-sustaining, profit-ori-

ented small business." 13 C.F.R. § 124.8–2(a).
   *Id.* at 678.

3. In *Eastern Canvas*, the Court described the procedure for graduation prior to the enactment of Pub.L. No. 96–481:

   SBA regulations further provide that "[a] section 8(a) concern which has substantially achieved the objective of its business plan will be notified that its participation in the program is completed." 13 C.F.R. § 124.8–2(e). Having achieved its business plan objective, the concern is said to have "graduated" from the § 8(a) program.
   580 F.2d at 678.

took effect. Congress thereby directed explicitly that the SBA and participating firms in the 2[8](a) program establish a timetable for the companies' departure from the 2[8](a) program to the normal market. In addition, the amendments prohibited the SBA from altering size standards until March 31, 1981.

At this point, the issue becomes complicated by SBA's failure to carry through the congressional mandate. The proposed regulations directed by Congress, due in February, 1981, were not published in the Federal Register until June 1, after the institution of this action. The proposed rules will be open for public comment until July 31, 1981. The regulations set out procedures for the SBA and participants in Section 2[8](a) to negotiate program graduation dates for the companies.

Against the background of this statutory and regulatory scheme, on May 1, 1981, the Administrator directed that Regional Administrators "immediately initiate" reviews of certain Section 2[8](a) participants to determine whether they were in fact "small businesses" and thus entitled to participate in the Section 2[8](a) program. Noting that such reviews, called size determinations, were to be handled routinely, the Administrator indicated that "[t]ermination or completion proceedings of those firms found large will be initiated immediately." Attached to the memorandum is a list, categorized by region, of over forty companies eligible to take part in the Section 2[8](a) program. Simultaneously issued with the May 1 memorandum to the Regional Administrators, was a press release, entitled "SBA Announces New Tough Policies for 2[8](a) Program," and a list of the fifty largest companies participating in the program.

Plaintiffs maintain that the May 1 action by the Administrator violates the Administrative Procedure Act's notice and comment requirements because it was actually the promulgation of a new rule concerning SBA enforcement of size standards. Pointing to the congressional directive in Pub.L. No. 96–481 that the SBA and the 2[8](a) participants negotiate over graduation plans, plaintiffs argue that the May 1 action is an unlawful attempt to circumvent the graduation procedures. Noting that their appearance on the size review list jeopardizes their ability to receive any further contracts, plaintiffs contend that in effect, the Administrator on May 1 debarred them from participation in the 2[8](a) program. Finally, the plaintiffs are concerned that agencies which now hold options on their services will not invoke those options if the companies face termination from the 2[8](a) program.

Defendant counters that the Administrator's action was not an exercise of illegal rulemaking, but rather was the issuance of a general policy statement specifically exempt from the notice and comment requirements of the Administrative Procedure Act. Pub.L. No. 96–481, the government suggests, in no way curtails the Administrator's discretion to ensure that the size standards for participation in the 2[8](a) program are met. Such size determinations, the defendant proffers, do not debar any company from 2[8](a) participation, and they are advisory only; the Administrator must decide to institute termination proceedings after any adverse decision as to a participant's size.

Initially, the Administrator's May 1 directive does not rise to the level of a rule. Rather, it was administrative action taken in accord with and under the direction of congressional and regulatory dictates. 15 U.S.C. § 634(b)(11) empowers the Administrator to

> make such investigations as he deems necessary to determine whether a recipient to or participant in any assistance under this chapter or any other person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of this chapter, or of any rule or regulation under this chapter, or of any order issued under this chapter.

*Id.* The effort at enhancing enforcement of size determinations is consistent with this statutory imposition of duty. In addi-

tion, 15 U.S.C. § 637(b)(6) directs the SBA to determine what firms are to be designated "small businesses" and to issue a certificate to that effect to the designated companies, providing that "[a]ny such certificate shall be subject to revocation when the concern covered thereby ceases to be a 'small business concern.' "

Arguing that the May 1 action is not a general policy statement, the plaintiffs maintain that the Administrator should have published an advance notice in the *Federal Register* about his new efforts to patrol the 2[8](a) program with size reviews and permitted plaintiffs to offer comments. The Court of Appeals has set out a standard to govern the determination when an administrative action is an effort at rulemaking subject to the Administrative Procedure Act's notice and comment provisions and when it is a general policy statement and thus exempt from those strictures.

> A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.

*Pacific Gas and Electric Co. v. Federal Power Commission*, 506 F.2d 33, 38 (D.C.Cir. 1974) (footnote omitted). *See also Batterton v. Marshall*, 648 F.2d 694 (D.C.Cir.1980).

■ The May 1 action is a classic example of a general statement of policy. The Administrator announced that he was going to ascertain whether SBA regulations were being violated, a course of action not only within his responsibilities but a vital part of those obligations. He indicated the course that the Administration would take in future adjudications, keeping a close watch on the size of 2[8](a) participants to determine whether in fact they were "small business-

es." No new standards were established for size determinations,[4] nor were any new procedural or substantive additions made to the 2[8](a) program's administration. That the Administrator choose to make his decision to seek size reviews by a public announcement of SBA activity does not transform his press release and anticipated follow-through into a rulemaking proceeding. Under existing regulations, in force and effect during the time plaintiffs have participated in the 2[8](a) program, the companies have been aware that the SBA could undertake size determinations when it thought them necessary.

■ The plaintiffs next contend that the Administrator acted in violation of Public Law No. 96–481's mandate of the establishment of graduation procedures. Except for the inexplicable delay in the promulgation of regulations, however, the Administrator's action was proper. By enacting the amendments to the Small Business Act, Congress demonstrated concern with the open-ended nature of the section 2[8](a) program, and accordingly thrust both the companies and the SBA to a determined goal by directing that the participants and the Administration negotiate over graduation dates. But nowhere in the statute did the Congress prohibit or limit size determinations or decide that graduation would be the only ground for termination from the 2[8](a) program. The Act leaves undisturbed the power of the Administrator to investigate and the power of the Administration to revoke the small business concern certificates. Congress did not construct a universal mechanism to facilitate a firm's departure from the 2[8](a) program. Rather, it established a method in addition to voluntary withdrawal or termination proceedings to ensure that only eligible participants were in the 2[8](a) program.

■ The view that Pub.L. No. 96–481 did not exclude the SBA from undertaking size determinations is borne by the legislative history of that Act. Indeed, the Senate

---

4. The plaintiffs' contention that the Administrator violated Pub.L. No. 96–481's proscription against the alteration of size standards is mis-

placed. No standards were altered by the May 1 action, rather, the Administrator sought to *enforce* currently existing standards.

expressly intended that the SBA undertake investigations of the type ordered on May 1. The report of the Select Committee on Small Business connected the proposal to set graduation dates with the need to ensure proper participation by small businesses.

> In view of the committee amendment requiring the Agency to set graduation dates for each portfolio firm, the Agency must conduct a review and analysis of the current portfolio giving particular attention to such matters as the growth rate of 8(a) firms, the number and dollar value of 8(a) and non 8(a) contracts received, and an analysis of the regional (and if and where appropriate, state or local) breakdown of firm concentration, contract performance, and market potential.

S.Rep. No. 974, 96th Cong., 2d Sess. at 21–22 (1980), U.S.Code Cong. & Admin. News 1980, pp. 4953, 4973. Additionally, the same report notes that "[f]or firms that are admitted into SBA's 2[8](a) procurement . . . [program], only three options are available for a firm to leave the program: (a) voluntary withdrawal; (b) termination proceedings; and (c) 'graduation.' *Id.* at 18, U.S.Code Cong. & Admin.News 1980 at 4970. Clearly, not only does the legislative history direct SBA to investigate 2[8](a) participants, but it also expressly recognizes that graduation procedures are adopted *in addition to* termination proceedings. Nowhere do the plaintiffs demonstrate a congressional intent to authorize regulations for graduation procedures to the exclusion of termination proceedings.

■ Finally, the legislative materials underlying Pub.L. No. 96–481 explicitly note the purpose of the 2[8](a) program to ensure that contracts are not merely redistributed from small businesses to minority-owned small businesses, but rather from large to small businesses. United States Senator Robert Morgan noted, "The continued participation of a few firms, in the absence of some compelling need, only injures those other small businessmen who could enter the market place through the 8(a) program." *Id.* at 22, U.S.Code Cong. & Admin.News 1980 at 4974. *See also* H.R.

Rep. No. 1434, 96th Cong., 2d Sess. at 15–16 (1980) U.S.Code Cong. & Admin.News 1980 at 5004. (Conf. Report) ("The SBA is strongly urged not to engage in practices which merely result in shifting contracts between the small and small minority business community, while large business continues to maintain its disproportionate share of the Federal procurement dollar.") The May 1 action clearly attempts to determine whether certain participants in the 2[8](a) program continue to meet eligibility requirements and if not, to terminate their participation in order to permit other firms to become competitively viable.

Plaintiffs' submissions to the Court indicate that the 2[8](a) companies affected by the May 1 action are already beginning to suffer loss of business because they are having a difficult time finding government agencies willing to utilize their services. They fear that the procuring agencies will not wish to deal with companies in an 2[8](a) contract that might be terminated from the program. Affidavits from the presidents of some of the plaintiff corporations detail the loss of revenue and the drastic effects of any work curtailment that they might suffer.

■ On July 17, 1981, the plaintiffs filed a Notice of Intention to Seek Temporary Restraining Order, in which plaintiffs highlight fears that particular contracts will not be awarded and enclose a memorandum expressing the intention of SBA to review various procurements involving firms undergoing size determinations. Although plaintiffs later decided not to seek temporary relief, their memorandum emphasizes again their concern that they have been *de facto* debarred from the 2[8](a) program merely because size determinations have been instituted. Defendant's response to this memorandum supports the view that the May 1 action was lawful, noting "that 8(a) firms are eligible for new contract awards even after they have been found to be large, until such time as the firm completes or is terminated from the program, and that each such award will be reviewed

carefully at the District, Regional, and Central Office Levels." Def. Mem. at 3, (July 20, 1981.) Moreover, the memorandum attached to plaintiffs' notice reflects nothing more than a likely recommendation from an acting regional administrator to the "Central Office" and a request for information from subordinate officials. In no way does it demonstrate that any of plaintiffs' legal rights have been or will be violated.

■ The Court is fully sympathetic to the plight of those whose economic affairs are entangled with activities of government agencies. But once the companies are involved in size determinations, the regulations provide them with the full panoply of due process rights of hearing and appeal. *See* 13 C.F.R. § 121.3–2, § 121.3–4. A size determination is not termination from the 2[8](a) program, and termination does not come absent an additional round of protective procedures specified by 13 C.F.R. § 121.1–2. At these proceedings, the companies can protest that the pendency of actions against them have harmed them economically. They will be able to fully demonstrate their current plight, if any, and similarly project future crisis.

■ After prolonged successful participation in the 2[8](a) program, and a comfortable acceptance of its "home-like" sheltering familiarity, plaintiffs resist accepting the fact that there is no entitlement to any particular 2[8](a) contact. They are merely participants in the program by which the SBA awards contracts to qualified businesses. They are fully eligible to participate in the § 2[8](a) program up to the point at which they are officially terminated, *see* Aff. of Robert L. Wright at ¶ 12, and even then, as noted, they may be under further obligation if an agency elects to invoke options on currently existing contracts. The plaintiffs' concerns are not unreasonable that once they are in the midst of a size determination, procurement awards to them are unlikely. Yet plaintiffs' challenge to the denial of an award must await exactly that: a denial of a contract. At that point, plaintiffs may be able to establish that they were impermissibly denied partic-

ipation in the 2[8](a) program merely because they were undergoing a size review. Whatever the merits be of any forthcoming dispute of course can be no concern to this decision. Here, on the situation currently before us, the Administrator's action was lawful and proper.

While the determination is made herein that the Administrator's May 1 action was lawful, and, indeed, the parties did not raise the ripeness doctrine, it remains questionable whether this action is ripe for resolution. In *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1966), the Supreme Court declared:

> Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Id.* at 148–49. For a matter to be fit for resolution, the Court must analyze whether the issues presented by the dispute are purely legal and whether the agency's action was final, viewing the practical effect on the challenger.

The Administrator on May 1 did not debar further participation by the plaintiffs. Indeed, they remain under an obligation to perform existing contracts. *See* Supp.Affid. of Robert L. Wright, ¶ 3. All the Administrator ordered was that these companies be reviewed for a determination of their size and that those who are found to be no longer "small businesses" would be the subject of further proceedings aimed at terminating them from the program. Although the size determinations themselves are advisory, *see* memorandum from Donald R. Templem to Donald W. Farrell, June

2, 1981, the Administrator indicated a clear intent to proceed with termination actions against large participants. Nonetheless, the only question presented at this stage is whether the businesses are *in fact* "small", and if so, then the companies will have an administrative forum to challenge efforts to terminate them, should such action occur. *See also Diamond Shamrock Corp. v. Costle*, 580 F.2d 670 (D.C.Cir.1978).

The 2[8](a) program has as its laudable goal the assistance of "small concerns owned and controlled by socially or economically disadvantaged persons to achieve a competitive position in the marketplace," 13 C.F.R. § 124.8(b), since such persons "have been deprived of an opportunity to develop and maintain a competitive position in the economy because of social or economic disadvantage." 13 C.F.R. § 124.8–1(c)(1). *See Eastern Canvas Products v. Brown*, 580 F.2d 675 (D.C.Cir.1978). The plaintiffs in this action, at the time they entered the 2[8](a) program, were deemed to satisfy all requirements for participation, and the 2[8](a) program has no doubt aided them in striving towards a competitive position. Under governing statutes and regulations, the SBA may not deprive participants in the 2[8](a) program of their contract rights until the companies either voluntarily withdraw from the program, graduate pursuant to negotiated dates of departure, or, most importantly, reach the level where, after appropriate procedures in accord with due process, the SBA determines them to be no longer eligible.

In summary, plaintiffs cannot avoid the existence of *two* independent procedures for the removal of a company from the list of § 2[8](a) participants. First, the Administration has the power and duty to enforce its rules and its statutory mandate to ensure that the firms in its programs are

eligible to continue participation. For this assurance, size reviews and termination proceedings exist. Second, Congress has directed that the SBA and the 2[8](a) participants negotiate and determine appropriate graduation dates for companies to begin to compete in the regular market. That Congress legislated the latter procedure does not in any manner eviscerate the authority of the SBA to invoke the former.[5]

---

5. The government contends that this action is barred by the doctrine of sovereign immunity by virtue of 15 U.S.C. § 634(b), which permits the Administrator to sue and be sued but provides that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property." *Id.*

While the court remains initially unpersuaded by that argument, it is unnecessary to address the question in light of the holding herein that the Administrator did not exceed authority provided him by the Small Business Act and that the plaintiffs are not entitled to equitable relief.