MARINETTE MARINE CORPORATION,
Plaintiff,

v.

DEPARTMENT OF the NAVY, and
Peterson Builders, Inc.,
Intervenor-Defendant.

MARINE POWER & EQUIPMENT
CO., INC., Plaintiff,

v.

Michael CARDENAS et al., Defendants,

and

Peterson Builders, Inc.,
Intervenor-Defendant.

Civ. A. Nos. 81–2103, 81–2459.

United States District Court,
Dist. of Columbia.

Oct. 29, 1981.

Roger N. Boyd, Peter B. Work, Frederick W. Claybrook, Jr., Washington, D. C., for plaintiff Marinette Marine Corp.

Dayton Lehman, Sp. Asst. U. S. Atty., Washington, D. C., for Dept. of Navy, and for defendants in CA 81–2459.

Maurice J. Mountain, Jr., Washington, D. C., for Peterson Builders, Inc.

Phillip H. Harris, Washington, D. C., for Marine Power & Equipment Co., Inc.

## MEMORANDUM

GASCH, District Judge.

These two cases began in this Court when Marinette Marine Corp. (Marinette) sought and obtained a temporary restraining order to prevent the Navy from awarding a small business set-aside contract to the low bidder, Peterson Builders, Inc. (PBI), until Marinette had an opportunity to exhaust the Small Business Administration (SBA) appeal process. Since that time the matter has gone through a number of permutations and five hearings before this Court until it is now ripe for final disposition on cross-motions for summary judgment.

## BACKGROUND

A. *The Procedural History.*

Although the essential facts are not in dispute, the convoluted procedural history of the case requires that the background be set out in some detail. On April 8, 1981, the Navy issued a request for proposals for the design and construction of a salvage ship denominated as the "ARS–50," to be delivered in 1985.[1] The ARS–50 solicitation contained an option to produce four additional ships and was restricted to small business concerns.[2] Under the applicable SBA regulations a qualifying small business must have averaged less than 1000 employees during the previous twelve months. 13 C.F.R. § 121.3–2, & Schedule B, Major Group 37 (1981).

The original closing date for the submission of proposals was June 15, 1981, but the Navy later extended the deadline to July 15, 1981. Timely proposals were submitted by Marinette, PBI, Marine Power and Equipment, Inc. (Marine), and Sea-Tac Alaska Corp., all of which self-certified under applicable regulations that they were qualifying small businesses.[3] PBI submitted the lowest priced proposal. The Contracting Officer, pursuant to Defense Acquisition Regulation (DAR) 1–703(b)(1),[4] notified the unsuccessful bidders that Peterson would get the ARS–50 contract and that they had five working days to protest PBI's small business status.

Each of the unsuccessful offerors submitted timely protests, which the Contracting Officer forwarded to the SBA. The SBA Regional Office in Chicago had responsibility for deciding these protests.[5] On August 26, 1981, the Chicago office informed the Contracting Officer by telephone that PBI had been determined to be a small business and that written notice would be sent to all interested parties.

A letter from the SBA Regional Office to Marinette, dated August 27, 1981, stated that Peterson was "a small business concern for the purpose of the procurement" and "any concern or other interested party which has been adversely affected by this decision shall have the right to appeal" to the Size Appeals Board of the SBA. Such interested parties, according to the letter, had five working days after receiving the letter to file an appeal. On August 28, 1981, the Contracting Officer awarded the

---

1. The ARS–50 class of ship will replace the aging ARS–38 class, which has been in operation since the mid–1940's. The new ships will not only be more efficient and cheaper to maintain but also will have the capacity to tow any Navy ship, a qualification which the ARS–38 class lacks.

2. Section K.64(a) of the solicitation states: "Offers received from firms which are not small business concerns shall be considered nonresponsive and shall be rejected."

3. 13 C.F.R. § 121.3–8 (1981).

4. 32 C.F.R. § 1–703(b)(1) (1979) (codifying Defense Acquisition Circular # 76–19).

5. *See* 13 C.F.R. § 121.3–4.

contract to PBI. Marinette learned of the Regional Office's decision and of the Contracting Officer's award later on the 28th from a representative of the Navy. The August 27, 1981 letter from the SBA Regional Office did not reach Marinette until September 1, 1981. Upon receipt of the letter, Marinette immediately notified the Contracting Officer that it intended to appeal the Regional Office's determination to the SBA Size Appeals Board.

On September 4, Marinette filed suit in this Court seeking to enjoin the Navy from proceeding with the ARS–50 contract. Marine filed a similar suit against the Navy and the SBA on the same date in the United States District Court for the Western District of Washington. On or about September 4, Marinette and Marine both filed appeals with the SBA Size Appeals Board.

On September 11, 1981, this Court heard Marinette's motion for a temporary restraining order. Because the Court was concerned that the Contracting Officer's precipitous action would frustrate Marinette's right of appeal to the Size Appeals Board, the Court issued a temporary restraining order and held that the award to PBI was conditional, pending a ruling by the Size Appeals Board that PBI was a small business. At a subsequent status call, the parties consented to an extension of the restraining order until a preliminary injunction hearing could be had on October 2, 1981.

On September 29, 1981, the SBA advised all parties by telephone that plaintiffs' appeals had been denied and that a written decision would follow in a few days. At the October 2 hearing, the Court noted that, because it did not have the written decision of the Size Appeals Board, it could not yet rule on the merits of the case. Therefore, the Court limited the hearing to the issue whether the restraining order should be extended. Expressing concern that Marinette, as the third low bidder, could not establish irreparable injury and might not prevail on the merits, the Court dissolved the restraining order.

On October 6, 1981, plaintiff Marine's motion for a temporary restraining order came on for hearing before the District Court in Washington State. In view of the pending proceedings in Marinette's suit, that Court transferred Marine's suit to this Court. On October 8, this Court heard Marine's motion for temporary restraining order. The two cases were consolidated, the motion denied, and the matter was set for a hearing on the pending motions to dismiss and for summary judgment. On October 14, 1981, the Size Appeals Board issued its written decision.

As a result of the complicated procedural history of this case, certain loose ends remained to be resolved by agreement of the parties: Marinette attacks the SBA decision but has not joined the SBA as a defendant; and Marine has sued the SBA but has not moved for summary judgment. The parties, being fully aware of these problems and recognizing that there is no issue as to material facts, have agreed to have the case decided on the merits. They have had ample opportunity to make their positions known both through briefs and in open court.

### B. The Underlying Facts.

The facts which led Marinette and Marine to challenge PBI's size status before the SBA are undisputed and revolve around two sets of actions which Peterson took in anticipation of the ARS–50 procurement: 1) certain reorganizations of the Peterson family's corporate holdings; and 2) the subcontracting for certain temporary workers with Northern Technical Services.

### 1. Kewaunee Affiliation.

Prior to July 10, 1981, PBI shared interlocking shareholders, directors, and officers with Kewaunee Engineering Corp. (Kewaunee). Members of the Peterson family owned 100% of the stock of PBI and approximately 65% of the Kewaunee stock. The remaining Kewaunee stock was owned by International Harvester. Because certain parties at PBI feared that this situation would lead to an SBA finding that the two companies were affiliated, a finding

that would lead to PBI's disqualification as a small business, certain actions were taken to alter the relationship between the two companies..

Fred J. Peterson resigned as Chairman of the Board of PBI. Ellsworth L. Peterson and Robert E. Peterson, sons of Fred J. Peterson, resigned as officers and directors of Kewaunee. Ellsworth and Robert transferred their stock in Kewaunee to their father; and Fred J. Peterson transferred 1233 shares of PBI stock to Ellsworth and Robert and the rest of his PBI stock back to the corporation. The corporation in turn distributed its shares of Kewaunee to Fred J. Peterson. Moreover, Fred J. Peterson's salary from PBI continued through August 31, 1981. These actions resulted in the following corporate structure:

| PBI | (approximate) percentages | Kewaunee | |
|---|---|---|---|
| Ellsworth L. Peterson, Director-President | 41.05% | Fred J. Peterson, Director-President | 62.15% |
| Robert E. Peterson, Director-Exec. V.P. | 14.13% | International Harvester | 35.04% |
| | | Fred J. Peterson II | .94% |
| James R. Peterson, Director | 12.05% | Margaret L. Port | .94% |
| Fred J. Peterson II, Dir.-Sec. | 11.70% | James R. Peterson | .62% |
| Margaret L. Port | 11% | Jonlee N. Peterson | .31% |
| Marsha L. Kerley | 6.74% | George R. DePrima, * Director | |
| MJP Revocable Trust | 2.63% | James S. Wilcox, * Director | |
| Sandra M. Peterson | .35% | Howard Balleine, Dir.-V.P.—Sales | |
| Jonlee M. Peterson | .35% | Kenneth Trakel, Dir.-V.P. Mfg. | |
| Joseph Gagnon, V.P.—Gen. Mgr. | | * Appointed to Board by International Harvester | |
| Joseph Angerer, V.P.—Engineering | | | |
| Ed Propson, V.P.—Operations | | | |
| Ralph J. Berg V.P.—Finance | | | |

*Appeal of Marinette Marine Corp. & Marine Power and Equipment Co.*, No. 1495 (Sept. 28, 1981), at 2 (hereinafter "Decision").

In examining the corporate reorganizations, the Size Appeals Board found that the day to day control of Kewaunee was in the hands of Howard Balleine and Kenneth Trakel, two long-time Kewaunee officials, and that, while other Peterson family members had power to control PBI, neither they nor PBI had power to control Kewaunee, which was controlled by Fred J. Peterson. Decision, at 5. The Board also found that, after the reorganization, Fred J. Peterson had no power to control PBI. *Id.* Consequently, the two companies were not, in the Board's view, affiliates. *Id.*

2. *The Temporary Employees.*

During May and June 1981, after the Navy's solicitation of proposals but before PBI made its submission, the company dismissed approximately 80 yard workers from its employ and contacted a personnel supply

agency,[6] Northern Technical Services (NTS) to help perform work under existing Navy contracts. These actions were taken for the express purpose of remaining a qualifying small business, that is, to maintain an average of less than 1000 employees for the preceding twelve months. It was clearly understood between PBI and NTS that this arrangement was to last only three to five months, until PBI's needs decreased. PBI maintained supervision and control over shipyard operations including those in which these employees worked, but all other incidents of employment—hiring, firing, issuance of pay checks, and withholding of social security and income taxes—was done by NTS.[7]

On the basis of these facts and an SBA inspection of PBI's operations, the Size Appeals Board found that PBI had an average of 998 employees for the preceding twelve calendar months and that the NTS employees should not be counted as PBI employees. Decision, at 5. The Board based the latter finding on the ground that NTS, not PBI, hired, paid, and did the withholding from these employees and because NTS was a legitimate subcontractor which was not affiliated with PBI. *Id.* at 7.

One final undisputed fact remains. If either the NTS or the Kewaunee workers are added to the PBI total, PBI will average more than 1000 workers and will not qualify as a small business for the ARS–50 procurement.

DISCUSSION

A. *The Validity of the Contract.*

■ The government defendants argue that this Court cannot overturn the ARS–50 contract after the Contracting Officer has awarded it, even if the SBA's size determination was erroneous. To support this proposition, the government defendants rely on the opinions by the Court of Claims in *Mid-West Construction, Ltd. v. United States,* 387 F.2d 957 (Ct.Cl.1967), and *Allen*

*M. Campbell Co. v. United States,* 467 F.2d 931 (Ct.Cl.1972). These cases are factually distinguishable from the present case and do not control the outcome here.

*Mid-West Construction* was decided before the decision in *Scanwell Laboratories, Inc. v. Schaffer,* 424 F.2d 859, 872 (D.C.Cir. 1970), which established that disappointed bidders on government contracts have standing to challenge the legality of such awards. Although decided after *Scanwell Laboratories,* the *Allen M. Campbell Co.* case dealt with a situation in which a district court had set aside a contract on the ground that the successful bidder was not a small business. The district court was subsequently reversed by the Court of Appeals, 467 F.2d at 932–33. The case does not stand for the proposition that a district court may not inquire into the legality of a small business set-aside award. Indeed, the Court of Claims explicitly withheld its view on that question. *Id.* at 934. Rather, the Court found that, in view of the district court's erroneous determination of the small business status of the protested bidder, a valid contract had been formed, and the government was liable to the protested bidder in damages under the contract's termination clause. *Id.*

The government's reliance on the two Court of Claims cases ignores the clear implication of the opinion by the Court of Appeals for this Circuit in *Eastern Canvas Products, Inc. v. Brown,* 580 F.2d 675 (D.C. Cir.1978). In that case, a disappointed bidder sought to enjoin the award of a contract on the grounds that the SBA had violated certain of its own regulations. *Id.* at 686–87. The District Court originally granted an injunction in that case but later lifted the injunction and granted summary judgment for the government. *Id.* at 677 & n.1. The Court of Appeals reversed and remanded because the district court did not consider all of the relevant issues in the

---

6. NTS had frequently supplied temporary workers to Peterson and other area industries in the past, but these employees have been skilled workers, architects or engineers, not yard workers.

7. Peterson seems to have set a general wage ceiling, but NTS set each individual's wage.

case. *Id.* at 688. *Eastern Canvas Products* clearly suggests that a district court has authority to delve into the legality of contracts when the SBA's failure to follow its own regulations is alleged.[8]

### B. *The Standard of Review.*

■ Although the plaintiffs do not ask the Court to make a *de novo* examination of PBI's size status, they urge the Court to give no deference to the agency's decision. Relying primarily on *Local 777, Democratic Union Organizing Committee, Seafarers Union of North America v. NLRB*, 603 F.2d 862 (D.C.Cir.1978), the plaintiffs urge the court to substitute its judgment for that of the Board. They argue that disposition of this case involves issues of common law agency and that the Board's decision does not accord with law. This contention and the plaintiffs' analogy between this case and *Local 777* must be rejected for a number of reasons.

First, the PBI situation raised a new set of facts which the SBA had never confronted before: the obtaining of temporary employees through a manpower type agency.[9] In *Local 777*, on the other hand, the NLRB had previously dealt with factual situations identical to that before it and had issued numerous inconsistent rulings on those cases. 603 F.2d at 869.[10] Moreover, there had been inconsistent determinations at the various agency levels in that case. *See id.* at 868. Here, on the other hand, the regional office and the Size Appeals Board both have ruled that PBI was a qualifying small business.

Second, the issues in this case are not issues of common law, in which the court has more expertise than the agency, but rather issues of interpretation of the SBA's regulations.[11] In contrast, *Local 777* did involve basic issues of common law. *See* 603 F.2d at 872. An agency's interpretation of its own regulations is entitled to considerable deference. *See Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

Finally, *Local 777* involved a statute which Congress had amended to change the definition of the term "employee." *See* 603 F.2d at 880. Here, on the other hand, Congress expressly refrained from interfering with the SBA's promulgation of regulations involving size status and numbers of employees for purposes of government procurements. *See* S.Rep.No. 1714, *reprinted in* [1958] U.S.Code Cong. & Ad.News 3071, 3077–78. This suggests that the Court should accord some deference to the agency's resolution of these matters.

The Court concludes, therefore, that it should not substitute its judgment for that of the SBA but should instead review this case under the arbitrary and capricious standard of 5 U.S.C. § 706(2)(A). Thus, if there is a rational basis which supports the agency's action, that action must be upheld. *See generally Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 34 (D.C.Cir.), *cert. de-*

---

**8.** Although the *Mid-West Construction* and *Allen M. Campbell Co.* cases do not dispose of the issues in this case, they do suggest that a district court should be extremely cautious in its treatment of the present case. *See* 467 F.2d at 934–35 (Nichols, J., concurring). Ill-advised intermeddling by district courts in the procurement process can impose considerable costs on both the government and private industry. Thus, such intrusions should be "circumspect and infrequent." *Id.* at 934 (quoting *Allen M. Campbell Co. v. Lloyd Wood Construction Co.*, 446 F.2d 261, 264 (5th Cir. 1971).

**9.** Plaintiffs' argument that this case is controlled by such prior Board cases as *Newton Lumber*, No. 502 (July 14, 1971), ignores the crucial distinction between this case and for-

mer cases—the presence of NTS as an unaffiliated subcontractor between the workers and PBI.

**10.** The Court in *Local 777* also seems to have been influenced by the cab company's reliance on the most recent NLRB decision, a decision ignored by the NLRB in ruling on the cab company's situation. 603 F.2d at 870. This reliance raises considerations not important in the present case.

**11.** As pointed out at page 594, *infra,* the contention that the SBA has adopted common law rules in interpreting its regulations depends solely on two decisions cited by the plaintiffs.

*nied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

### C. *The Merits.*

■ There are two substantive challenges to the Board's decision: 1) that it erred in ruling that Kewaunee was not affiliated with PBI and 2) that it erred in not counting the temporary workers supplied by NTS as PBI employees.

### 1. *The Kewaunee Affiliation.*

The plaintiffs launch a three-pronged attack on the Board's finding that PBI and Kewaunee are not affiliates. They argue 1) that the Board ignored the presumption that family members have an identity of interest; 2) that the Board failed to apply the rationale set out in *Maurice Construction Co.,* No. 115 (1964), and 3) that the Board did not apply the "clear line of fracture" test which it has applied in past cases. None of these contentions is persuasive.

SBA regulations state that companies are affiliates when

> (1) one concern controls or has the power to control the other, or
>
> (2) a third party or parties controls or has the power to control both. In determining whether concerns are independently owned and operated and whether or not affiliation exists, consideration shall be given to all appropriate factors, including common ownership, common management, and contractual relationship.

13 C.F.R. § 121.3–2(a) (1981). A "party" consists of

> two or more persons with an identity of interest such as members of the same family .... In determining who controls or has power to control a concern, persons with an identity of interest may be treated as though they were one person.

**12.** Even the *Maurice Construction Corp.* decision, relied on so heavily by plaintiffs, cites only the first provision. *See* No. 115, at 1.

**13.** The three previous Board cases cited for this proposition do indeed support it. *See* Appeal of Kasper Brothers, No. 1252 (April 9, 1979), at 8; *Recertification of Propper International, Inc.,* No. 838 (January 8, 1976), at 3; Appeal of

*Id.* Plaintiffs' first argument is that these regulations create a presumption that members of the same family have an identity of interest for the purpose of determining affiliation and that the Board's decision in this case fails to apply this test. This argument elevates the second of the provisions quoted above to predominant importance. The Board, on the other hand, has consistently focused on the language set out in the first blocked quote.[12] Moreover, the Board has made it clear that family relationships do not necessarily create affiliation. Decision, at 5.[13]

Previous Board decisions, rather than dwelling on whether a "presumption" of control arising from family relationships exists or has been rebutted, focus on whether all of the facts of a case demonstrate that a concern or individuals control or have power to control another firm.[14] Indeed, the "leading" case on the issue seems to be *Western States Meat Packers Association,* No. 261 (July 27, 1967), which stated:

> Existence of control is a factual matter to be ascertained by weighing all of the evidence and drawing reasonable inferences therefrom .... [T]he Board must look to the substance of the relationship and not to the description ....

*Id.* at 3 (*quoted in Espey Manufacturing and Electronics Corp.,* No. 278 (Dec. 19, 1967)). This general approach has repeatedly been used by the Board in examining questions of affiliation. *See, e. g., Salmon River Lumber Co.,* No. 1267 (June 5, 1979), 3–4; *Recertification of Propper International, Inc.,* No. 838 (Jan. 8, 1976), 3; *Advance Building Maintenance Co.,* No. 191 (May 21, 1966), ¶¶ A, D, E.

The decision of the Board in examining PBI's alleged affiliation with Kewaunee

Maintenance Engineers, No. 770 (July 30, 1975), at 1.

**14.** The regulations themselves suggest that the Board has wide latitude in determining whether family relationships create affiliation. Persons with an identity of interest may, but do not necessarily have to, be treated as if they were one person. *See* 13 C.F.R. § 121.3–2(a)(ii).

also followed this sáme general approach. First, the Board examined all the evidence presented to it. It noted that Balleine and Trakel ran Kewaunee on a day-to-day basis, examined the historical separation of PBI and Kewaunee, and reviewed the affidavits presented by both sides. From this evidence, the Board made its decision on the central issue: "while the other Peterson family members have power to control PBI neither they nor PBI have power to control Kewaunee which is controlled by Fred J. Peterson. Fred J. Peterson has no power to control PBI." Decision, at 5.

This case is factually distinguishable from *Maurice Construction Co.*, No. 115 (Dec. 14, 1964). In that case both corporations were wholly owned by members of the same family, and consequently there was considerable overlap in stock ownership, even after the corporate reorganization. In contrast, thirty-five percent of Kewaunee stock is owned by International Harvester Co., and while three members of the Peterson family do own stock in both companies, their holdings total less than two percent of Kewaunee. In *Maurice Construction Co.*, the Board found that the affiliated companies had not dealt at arms length; here the Board found that the two companies had been operated as separate concerns for years. The differences in the two cases are great enough that the Board was not arbitrary and capricious when it failed to cite the earlier case as dispositive precedent in the PBI determination.

The plaintiffs' final salvo on this issue is that the Board erred in not finding a "clear line of fracture" between PBI and Kewaunee. Admittedly, the Board has used this terminology in some previous cases. *See Advance Building Maintenance Co.*, *supra*, at 3; *Espey Manufacturing and Electronics Corp.*, *supra*, at 4.[15] Yet in this case the Board found that "the information indicates clearly that there has been a separation of

control of the concerns and that, since July 9, 1981, they have no longer been under common management or common control." Although it might have been helpful if the Board had used its usual terminology in making this statement, the sentence clearly indicátes that the two companies have functioned separately at least since July 9, 1981. The Court will not quibble over what words the Board elects to use. The situation described in the quoted passage equals a clear line of fracture; and the rest of the decision seems consistent with general Board precedent. Thus, the decision of the Board must be upheld on the affiliation issue.

### 2. *The NTS Workers.*

Plaintiffs contend that in not counting the NTS workers as PBI employees the Board ignored both its own precedents and a vast body of common law on the issue of what constitutes an employee. Although this issue is perhaps more difficult than the affiliation issue, the Court cannot say that the Board's decision was without a rational basis.

The pertinent regulations on this issue provide that

"Number of employees" means the average employment of any concern ... based on the number of persons employed on a full-time, part-time, temporary, or other basis during each of the pay periods of the preceding 12 months.

13 C.F.R. § 121.3–2(t) (1981). Plaintiffs contend that the Board has "traditionally" applied the common law standard of control to determine whether an individual who provides services to a company is an employee of that company. However, the "tradition" cited consists of one or, at most, two Board decisions[16] and a plethora of agency and court decisions in other and unrelated contexts.

---

15. Other Board opinions on the issue of affiliation do not use the term "clear line of fracture." *See Maurice Construction Co., supra; Maintenance Engineers, supra; Recertification of Propper International, Inc., supra.*

16. *Newton Lumber Co.*, No. 502 (July 14, 1971), at 3, explicitly adopts the common law, but *Fairfield Scientific Corp.*, No. 412 (March 6, 1970), at 2, merely speaks generally about "control," without mentioning the source of this test.

The plaintiffs fail to understand that this case is, as the Board pointed out, different from those two cases, *Newton Lumber Company*, No. 502 (July 14, 1971), and *Fairfield Scientific Corp.*, No. 412 (March 6, 1970), in which the Board applied the control test. In both of those cases, the workers at issue were hired directly by the company whose size status was at issue, and the question was whether those workers were employees or independent contractors. Here the question is whether workers, who are admittedly employees of NTS, a bona fide subcontractor which is not affiliated with PBI, should also be counted as employees of PBI for purposes of determining its size status. This distinction is important because the Board has never before dealt with this precise situation. Consequently, the Board cannot properly be accused of inconsistently dealing with the issue. This case does not revolve around the employee-subcontractor determination but rather around another common law doctrine known as the borrowed or loaned servant rule.[17]

Even if the Court assumes that the Board has adopted a common law approach to the employee-subcontractor issue, this approach does not necessarily mean that the Board has adopted all aspects of the common law of agency or master-servant. The Court realizes that common law principles have been applied by both agencies and the courts in the other contexts pointed out by the plaintiffs, but the Court is unwilling to substitute its judgment for that of the Board on this matter.[18] Moreover, the Board's decision adequately states its reason for not following such precedent as *Newton Lumber Co.* in these circumstances.

Even assuming for the sake of argument that the Board should have followed common law precedent in deciding PBI's size status, the facts on which the Board relied suggest that the decision was certainly not arbitrary and capricious. In *Newton Lumber Company, supra*, at 3, the Board spelled out four factors that determined whether a worker was an employee or an independent contractor: (1) engagement and selection of the employee; (2) the payment of wages; (3) the power of dismissal; and (4) control over the worker's conduct of his duties. Only . the fourth point cuts against the Board decision. NTS hired and fired the workers, paid their wages, and withheld Social Security and income taxes; PBI controlled and supervised the workers while they were on the job. While control is the "most important" aspect of this determination, it is not the only factor, and in at least one other case, the payment of wages determined whether "employment" existed for size status purposes. *See Atlantic Plastic and Chemical Co.*, No. 1290 (August 27, 1979),[19] at 4. Even if the Board were held to a common law standard, its decision is not completely out of line with its past decisions. Thus, the Court should not set aside the Board decision as irrational, arbitrary, or capricious.

CONCLUSION

Because the Board's ruling on the undisputed facts of this matter was not arbitrary and capricious, the Court must grant the defendant's and intervenor-defendant's motions for summary judgment. The questions in this case are close, on both the affiliation and the temporary workers, but

---

**17.** See 53 Am.Jur.2d *Master and Servant* §§ 26, 326, 415 (1970). Indeed, the employee of a subcontractor or independent contractor is not usually held to be a fellow servant to the employees of the general employer. *See id.* § 331. Thus, even in the common law there are situations in which NTS employees would not be counted as PBI employees.

**18.** The plaintiffs argue that if the Board's decision is allowed to stand, the door will be open for any company, no matter how large, to masquerade as a small business merely by subcontracting through an agency such as NTS. Al-

though this argument, on its face, has some appeal, there were extenuating circumstances in this case, such as the temporary nature of the NTS contract. Moreover, the Board has shown itself able to preclude what it sees to be attempts to circumvent the purposes of the Small Business Act. *See Lester B. Holmes Co.*, No. 569 (July 19, 1972).

**19.** The other case cited by the Board for this proposition does not seem relevant. *See Garland Industries*, No. 1456 (June 24, 1981).

when the Board's decision is analyzed in the light of these undisputed facts, the defendants must prevail.